Franz H. PENNER and Katharina Penner, Lucille Penner, etc., et. al., Appellants,

v.

Richard A. KING, Director of Revenue, Respondent.

Robert R. KING, Appellant,

v.

Richard A. KING, Director of Revenue, Respondent.

Nos. 66657, 66658.

Supreme Court of Missouri, En Banc.

Sept. 10, 1985.

Ezra Eli Borntrager, Kansas City, for appellants.

John Ashcroft, Atty. Gen., Richard L. Weiler, Asst. Atty. Gen., Jefferson City, for respondent.

BLACKMAR, Judge.

In this consolidated appeal, appellants Penner and King seek to overturn decisions of the Circuit Courts of Barton and Clay Counties upholding the Director of Revenue's denial of appellants' applications for driver's licenses. Appellants refused to disclose their social security numbers in spite of § 302.181, RSMo Supp.1984, which requires that a Missouri driver's license "... bear the licensee's social security or tax identifying number, if the licensee has one...." Both appellants argue that the required disclosure violates federal statutes and infringes the constitutional right

of privacy. Appellants Penner also allege that mandatory disclosure of social security numbers by driver's license applicants infringes their religious freedom, because compliance with the requirement is inconsistent with their sincerely held religious beliefs.[1] We are of the opinion that our statute constitutes a valid exercise of the legislative power, not inconsistent with any federal statute or with federal or state constitutional rights. Nor are any further proceedings necessary to determine the constitutional issues. It follows that the judgments must be affirmed.

### I.  *Constitutional Validity*

There are cases in which individuals have been excused from complying with statutes and regulations of general application on account of their religious beliefs. In *Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), the Supreme Court of the United States held that school children who regarded the flag of the United States as a "graven image" (Exodus 20:4, Deuteronomy 5:8) could not be compelled to salute the flag or to recite the pledge of allegiance. In *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Court held that children could not be compelled to attend accredited school past the ninth grade, when the religious views or those of their parents dictated other modes of instruction. In *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), it was held that a New Hampshire motorist could not be required to display the state motto, "Live Free or Die" on his license plate, in violation of his religious tradition.

■ Yet a person may not always avoid the impact of statutes which serve an important public purpose, within the legislative power, by interposing an individual religious belief. *Davis v. Beason*, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890) held that the practice of polygamy could properly be proscribed by statute, even though sanctioned by religious belief. In *Jacobson v. Massachusetts*, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905) the Court held that a person could be obliged to submit to vaccination against smallpox even though the procedure ran contrary to his religious views.

Governmental scrutiny of the sincerity of one's religious belief is offensive to our tradition of individual rights. A balancing of interests is nonetheless necessary when a claim of individual religious belief is set up in opposition to the police power. If a statute serves an important public interest, even those with religious scruples may be required to comply.

■ The Court, furthermore, is obliged to uphold legislative enactments, when challenged on constitutional grounds, unless the unconstitutionality is clearly demonstrated. The legislative power is plenary and residual, subject only to the limits of the federal and state constitutions. *State ex rel. Holekamp v. Holekamp Lumber Co.*, 340 S.W.2d 678 (Mo. banc. 1960). This Court, therefore, must uphold a statute if there is any valid basis on which the legislature could have acted. It is no light matter to strike down an enactment of the people's representatives, or to excuse a particular person from compliance with a statute of general application.

By our recent holdings the courts are obliged to examine legislation which is claimed to infringe on civil liberties, and to determine from the face of the legislative enactments the nature and quality of the public interest involved. Evidence may be helpful in some cases, but is not essential. The principles of judicial notice may be freely utilized.

■ We do not agree with the suggestion that the importance of the public interest must be determined on the basis of

---

1. It is appellants' belief that the social security number is developing into a mark that will be used as an identifier. This "identifier" is equated with the "mark of the beast" as foretold in the Bible, Revelation 13:16, 14:9–10. We do not question appellants' sincerity in their beliefs.

recitals in the legislature's enactment, or evidence in the trial court. This Court rejected that approach in *State ex rel. Gavin v. Gill*, 688 S.W.2d 370 (Mo. banc 1985). *See also, Pollard v. Board of Police Commissioners*, 665 S.W.2d 333 (Mo. banc 1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 3534, 87 L.Ed.2d 657 (1985). The Missouri General Assembly has not followed the practice of including preambles or recitals to explain the legislative purpose. It does not preserve committee reports in documentary form. Transcripts of proceedings are not available. It is not for us to say whether a change in these procedures would be desirable or worth the expense. Judicial insistence on recital or evidence would put pressure on the legislature to depart from its established procedure.

We have no difficulty in perceiving the purpose behind the legislative requirement. The automobile dominates our society and our economy. Motor vehicle operators are properly subject to competency examination and licensing. The identification of the operator is important. The social security number serves to distinguish a person from others with the same or similar names. The disclosure, then, might inhibit a person in obtaining or using a license fraudulently or improperly. The legislative scheme might be impeded if persons could simply opt out by asserting religious inhibitions. The director acted properly in denying an individual exemption to the defendants.

■ The state may justify an inroad on religious liberty by showing that the regulation is the least restrictive means of achieving a compelling state interest. *Thomas v. Review Board*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). Even if the requirement that the license show a social security number be considered an inroad, the state has shown ample justification. It is important for the

state to identify drivers and to learn about a person's driving record in other states. To keep dangerous drivers off the road, driver's licenses may be denied to those who have bad driving records elsewhere. The use of the social security number provides the most efficient method of locating interstate driving records. It is apparent that the state has a compelling interest and no less restrictive means for accomplishing its purpose. The infringement on appellants' religious beliefs is justified.

Our conclusion is supported by *Conant v. Hill*, 326 F.Supp. 25 (E.D.Va.1971), in which the constitutional issues were found to be unsubstantial, and by *Cantor v. Supreme Court of Pennsylvania*, 353 F.Supp. 1307 (E.D.Pa.1973). *See also McElrath v. Califano*, 615 F.2d 434, 441 (7th Cir.1980); *Greater Cleveland Welfare Rights Organization v. Bauer*, 462 F.Supp. 1313 (N.D.Ohio 1978). The respondent adduces the opinion of Circuit Judge Forrest Hanna of our 16th Judicial Circuit in a similar case, in which he analyzes the issues astutely but, in our opinion, places undue restrictions on the state in view of his finding of "extra efficiencies." It is inappropriate for a court to relegate the legislature to a less satisfactory alternative.

The case of *Quaring v. Peterson*, 728 F.2d 1121 (8th Cir.1984), affirmed by an evenly divided court *Jensen v. Quaring*, —— U.S. ——, 105 S.Ct. 3492, 86 L.Ed.2d 383 (1985), in which a person sought to avoid compliance with a state law requiring pictures on driver's licenses, involves arguably similar issues.[2] We would reject the majority opinion of the Eighth Circuit Court of Appeals, in favor of Judge Fagg's dissent demonstrating a proper public purpose. It appears that the Court majority simply substituted its judgment for that of the legislature as to the wisdom of and the necessity for the statutory requirement of

---

**2.** Section 302.181.4, RSMo 1978, provides a procedure by which an applicant may avoid the use of his picture, contrary to religious conviction.

Whether to grant a similar privilege for social security numbers is for the legislature to decide.

a picture. Inasmuch as the Supreme Court of the United States was unable to resolve the problem, but rather divided evenly, the issue comes to us as an open one.

We also reject the plaintiff's claims of right of privacy under the federal and state constitutions. Constitutional rights of privacy are not well defined. This case is not at all like *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) or *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), which involved intrusion into intimate matters. Nor does it resemble *Labor's Educational and Political Club-Independent v. Danforth*, 561 S.W.2d 339 (Mo. banc 1977), in which political participation was subjected to the glare of publicity. The right of the state to maintain a complete and accurate roster of those authorized to operate motor vehicles justifies the minimum intrusion imposed by the statute.

■ The statute, furthermore, does not impede the defendants in the practice of their religion. Operation of a motor vehicle on the highways of the state is a privilege which is subject to conditions in the public interest. The plaintiffs may preserve their religious scruples intact by foregoing this privilege. It is for them to balance the resulting inconvenience.

## II. *Statutory Validity*

Section 302.181.1, RSMo Supp.1984, initially enacted in 1971 (L.Mo.1971, p. 320, H.B. 365), reads in pertinent part as follows:

All licenses shall bear the licensee's social security or tax identifying number, if the licensee has one, and if not, then a number assigned to the licensee by the director, the expiration date of the license, the name, date of birth, residence address, and brief description and colored photograph of the licensee, and either a facsimile of the signature of the licensee or a space upon which the licensee shall write his usual signature with

pen and ink immediately upon receipt of the license....

The plaintiffs rely on portions of the "Privacy Act of 1974," (P.L. 93–579, 88 Stat.1896, 1909, 5 U.S.C. § 552a note), as follows:

Sec. 7. (a)(1) It shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number.

(2) the provisions of paragraph (1) of this subsection shall not apply with respect to—

\*       \*       \*       \*       \*       \*

(b) the disclosure of a social security number to any Federal, State, or local agency maintaining a system of records in existence and operating before January 1, 1975, if such disclosure was required under statute or regulation adopted prior to such date to verify the identity of an individual.

(b) Any Federal, State, or local government agency which requests an individual to disclose his social security account number shall inform that individual whether that disclosure is mandatory or voluntary, by what statute or other authority such number is solicited, and what uses will be made of it.

42 U.S.C. § 405(c)(2)(C), however, reads as follows:

(C)(i) It is the policy of the United States that any State (or political subdivision thereof) may, in the administration of any tax, general public assistance, driver's license, or motor vehicle registration law within its jurisdiction, utilize the social security account numbers issued by the Secretary for the purpose of establishing the identification of individuals affected by such law, and may require any individual who is or appears to be so affected to furnish to such State (or political subdivision thereof) or any

agency thereof having administrative responsibility for the law involved, the social security account number (or numbers, if he has more than one such number) issued to him by the Secretary.

(ii) If and to the extent that any provision of Federal law heretofore enacted is inconsistent with the policy set forth in clause (i) of this subparagraph, such provision shall, on and after October 4, 1976, be null, and void, and of no effect.

(iii) For Purposes of clause (i) of this subparagraph, an agency of a State (or political subdivision thereof) charged with the administration of any general public assistance, drivers' license, or motor vehicle registration law which did not use the social security account number for identification under the law or regulation adopted before January 1, 1975, may require an individual to disclose his or her social security number to such agency solely for the purpose of administering the laws referred to in clause (i) above and for the purpose of responding to requests for information from an agency operating pursuant to the provisions of part A or D of subchapter IV of this chapter.

■ The appellants' arguments as to why the exception does not permit the state to require the social security number on drivers' licenses are quibbling. The requirement was in place on January 1, 1975, in the plain language of our statute. The failure of the administrative authorities to require the number on the appellants' previous applications does not estop the state from enforcing the law as to subsequent renewals. The plaintiffs were adequately advised that the disclosure was mandatory when they were denied licenses for failure to disclose. The requirement is listed along with other identifying data, and so the requirement of disclosure is patently "for purposes of identification."

The judgments should be affirmed.

HIGGINS, C.J., BILLINGS, WELLIVER and RENDLEN, JJ., and MORGAN, Sr. J., concur.

DONNELLY, J., concurs in separate opinion filed.

ROBERTSON, J., not participating because not a member of the Court when cause was submitted.

DONNELLY, Judge, concurring.

This case involves the validity of § 302.-181, RSMo Supp.1983, which requires that a Missouri driver's license "shall bear the licensee's social security or tax identifying number, if the licensee has one * * *." Appellant King refused to disclose his social security number alleging a violation of his right of privacy. Appellant Penner refused to disclose his social security number alleging a violation of his right of privacy and an interference with his rights of conscience. Their applications for licenses were denied. Accordingly, this case presents an apparent conflict between the will of the State and individual rights.

The source of our determination lies in the articulation of the relationship between the people of Missouri and their government in Article I of our Constitution.

Section 1. **Source of political power —origin, basis and aim of government.**—That all political power is vested and derived from the people; that all government of right originates from the people, is founded upon their will only, and is instituted solely for the good of the whole.

Section 2. **Promotion of general welfare—natural rights of persons— equality under the law—purpose of government.**—That all constitutional government is intended to promote the general welfare of the people; that all persons have a natural right to life, liberty, the pursuit of happiness and the enjoyment of the gains of their own industry; that all persons are created equal and are entitled to equal rights and opportunity under the law; that to give security to these things is the principal office of government, and that when

government does not confer this security, it fails in its chief design.

Section 3. **Powers of the people over internal affairs, constitution and form of government.**—That the people of this state have the inherent, sole and exclusive right to regulate the internal government and police thereof, and to alter and abolish their Constitution and form of government whenever they may deem it necessary to their safety and happiness, provided such change be not repugnant to the Constitution of the United States.

Our Constitution also acknowledges the individual's rights of conscience and privacy. It expressly provides that "all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; that no human authority can control or interfere with the rights of conscience; * * *." Mo. Const. art. I, § 5. There is no express recognition of the right of privacy in our Constitution. However, in *Barber v. Time, Inc.*, 348 Mo. 1199, 1205, 1206, 159 S.W.2d 291, 294 (1942), this Court stated that "[t]he basis of the right of privacy is the right to be let alone" and that "the right of privacy * * * is, or at least grows out of, a constitutional right."

The powers of the State and the rights of individuals coexist in a tenuous balance. The nature of this relationship has been addressed by the scholars:

"Liberty of conscience is limited * * * by the common interest in public order and security. * * * The government's right to maintain public order and security is an enabling right, a right which the government must have if it is to carry out its duty of impartially supporting the conditions necessary for everyone's pursuit of his interests and living up to his obligations as he understands them. * * * [But] liberty of conscience is to be limited only when there is a reasonable expectation that not doing so will damage the public order which the government should maintain. * *

The limitation of liberty is justified only when it is necessary for liberty itself, to prevent an invasion of freedom that would be still worse." J. Rawls, A Theory of Justice 212, 213, 215 (1971). "[T]he state must limit its coercion to protecting what free and rational persons acknowledge and accept as the general conditions of life, integrity, and security that are necessary to pursue the ends defined by their independent consciences." Richards, Conscience, Human Rights, and the Anarchist Challenge to the Obligation to Obey the Law, 18 Ga.L.Rev. 771, 780 (1984). "The minimal state treats us as inviolate individuals, who may not be used in certain ways by others as means or tools or instruments or resources; it treats us as persons having individual rights with the dignity this constitutes. Treating us with respect by respecting our rights, it allows us, individually or with whom we choose, to choose our life and to realize our ends and our conception of ourselves, insofar as we can, aided by the voluntary cooperation of other individuals possessing the same dignity. How *dare* any state or group of individuals do more. Or less." R. Nozick, Anarchy, State and Utopia 333–34 (1974).

The State is free to assert the common interest "in accordance with its own conception of policy and fairness, unless in so doing it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). Mr. Justice Cardozo called this relationship "ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937).

The essential question here is: When a choice must be made between a statute which purports to serve a common public interest and the right to be let alone, which shall yield? This is a question we must answer as the ultimate arbiter between the State and the individual. *See* B. Siegan, Economic Liberties and the Constitution 317 (1980).

In *State v. Kennedy*, 295 Or. 260, 666 P.2d 1316, 1321 (1983), the Supreme Court of Oregon said:

"This court like others has high respect for the opinions of the Supreme Court, particularly when they provide insight into the origins of provisions common to the state and federal bills of rights rather than only a contemporary 'balance' of pragmatic considerations about which reasonable people may differ over time and among the several states. It is therefore to be expected that counsel and courts often will refer to federal decisions, or to commentary based on such decisions, even in debating an undecided issue under state law. Lest there be any doubt about it, when this court cites federal opinions in interpreting a provision of Oregon law, it does so because it finds the views there expressed persuasive, not because it considers itself bound to do so by its understanding of federal doctrines.  * * *."

In the manner of Oregon, I would borrow from the United States Supreme Court what is persuasive and would "begin * * * to meaningfully implement the provisions of the Missouri Bill of Rights." *Baker v. State*, 584 S.W.2d 65, 72 (Mo. banc 1979) (Donnelly, J., dissenting). "[S]tate courts no less than federal are and ought to be the guardians of our liberties." Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv.L.Rev. 489, 491 (1977).

However, I serve no useful purpose by dissenting again and again.

I concur.